# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


HPS TECHNOLOGIES, INC.,      )
     )
         Plaintiff,      )
     )
       v.      )      1:06CV1061
     )
E.I. DU PONT DE NEMOURS AND CO.,      )
     )
         Defendant.      )


## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motion for summary judgment filed by Defendant E.I. Du Pont De Nemours and Co. (DuPont) (Docket No. 73), and on Plaintiff's motion to dismiss without prejudice its trade secrets claim. (Docket No. 60.) Plaintiff HPS Technologies (formerly known as NuPro Technologies) has opposed Defendant's summary judgment motion. (Docket No. 79.) Defendant concedes that Plaintiff should be allowed to dismiss its trade secrets claim but only upon certain terms and conditions that Defendant suggests. (Docket No. 64.) The Court heard oral argument on Defendant's summary judgment motion on September 30, 2009. Both of these motions are now ready for decision, and, for the reasons stated herein, the Court concludes that both motions should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant DuPont and Plaintiff HPS are both involved in the business of developing solvents for use in the flexographic printing industry. (Docket No. 13, Amended Complaint ("Am. Compl."); Docket No. 74, Def.'s Mem. Of Law in Supp. of Mot. for Summ. J. ("Def.'s Br.")) Beginning in 1997, Defendant and Plaintiff began exploring the possibility of Plaintiff supplying Defendant with a commercial solvent to replace Defendant's solvent, Optisol. (*Id*.) Customers using Optisol complained of its unpleasant odor. (*Id*.) To facilitate the exchange of information, the parties executed five confidentiality agreements (CDA's) over the years 1998-2004. (*Id*.)

These CDA agreements, and particularly the latter agreements pertinent to this action, covered a one-year term with a further provision that any "Confidential Items" exchanged between the parties during the one-year term would not be used or disclosed to third parties for a specified period of time[1] after the termination of the one-year term. (Docket No. 75 App. of Documents in Supp. of Def.'s Mot. for Summ. J., Exs. 13-17.) The pertinent agreements allowed the use of "Confidential Items" "only for . . . evaluating a potential business relationship between DuPont and Participant in the area of flexographic photopolymer plate solvents." (*Id*., Exs. 15-16.) The final CDA added the language "and solvent recovery equipment and processes" to the above stated purpose. (*Id*., Ex. 17.)

---

[1] This extended period is 3 years for the agreements pertinent to this action. (Docket No. 75, Exs. 15-17.)

The pertinent CDA agreements provide that the obligation of non-use and non-disclosure only apply to items designated as confidential. (*Id.*, Exs. 15-17.) The agreements also contain a provision stating that the obligation of non-disclosure and non-use "shall not apply to" certain items. (*Id.*) There are four categories of items to which the obligation of non-use and non-disclosure do not apply, including those which:

    a.    are available to the public or become available to the public through no fault, unauthorized act or omission by the Recipient;

    b.    are known by the Recipient at the time of disclosure, as shown by prior written records;

    c.    are rightfully received by the Recipient from a third party without a duty of confidentiality; or

    d.    are developed by or for the Recipient independent of the disclosure hereunder.

(*Id.*, Exs. 15-17, ¶ 11.) The agreements also provide that disclosed confidential items do not fall within these exceptions (a-d) "merely because such items are embraced by more general publicly known items or items in Recipient's possession. In addition, any combination of features shall not be deemed to be within the foregoing exceptions (a-d) merely because individual features are within the foregoing exceptions, but only if the combination itself and its principle of operation are within the foregoing exceptions (a-d)." (*Id.*)

The parties exchanged materials and solvent samples pursuant to these agreements. In 2006 DuPont began marketing its own solvent product, Cylosol, to replace Optisol. The parties never entered into any agreement for Plaintiff to supply Defendant with its solvents.

Plaintiff claims in its Amended Complaint that in early 2004 Defendant ordered

multiple drums of Plaintiff's solvents for the purpose of internal evaluation. (Am. Compl. ¶ 8.) One drum of Nutre Clean XP (XP) was delivered to Defendant in July 2004, and six drums of XP were delivered in November 2004. (*Id*.) As the basis for Plaintiff's breach of contract claim (First Claim for Relief), Plaintiff alleges that Defendant "either used plaintiff's information, which was identified as 'Confidential' in fulfillment of requisite conditions precedent, or undertook a chemical analysis of same in order to develop a product of its own." (*Id*.) The breach occurred in 2004 according to Plaintiff. (Docket No. 79, Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 11-12.) Plaintiff claims that its XP solvent had solved the two problems that DuPont's internal efforts to produce a solvent could not: create a high-performance solvent with a low odor. (*Id*. at 16.) According to Plaintiff, it was only after DuPont chemist Rajgopal Subramanian, who was heading up the effort to produce a solvent to replace Optisol, visited locations where Plaintiff's XP product was being used and learned from Plaintiff's president, David Bradford, that XP contained benzyl alcohol as the co-solvent[2] and Isopar L as the non-solvent, that Subramanian developed the formula that would become Cylosol, DuPont's replacement product for Optisol. (*Id*.) Cylosol also uses benzyl alcohol as the co-solvent and Isopar L as the non-solvent. (Def.'s Br. at 10.)

---

[2] Flexographic developer solvents typically have three ingredients: (1) an active ingredient to dissolve the polymer not exposed to light; (2) a co-solvent to dissolve the release layer; and (3) the non-solvent to dilute the solvent and reduce cost and odor. (Docket No. 75, Ex. 9 at 3-4.)

-4-

Plaintiff's Second Claim for Relief is for fraud. (Am. Compl. at 5.) Plaintiff claims that Defendant made false "promises and misrepresentations" to Plaintiff "as part of its fraudulent plan and scheme to acquire plaintiff's confidential and protected alternative solvent technology." (*Id*.)

Plaintiff's Third Claim for Relief is made pursuant to the North Carolina Unfair and Deceptive Trade Practices Act. *See* N.C. Gen. Stat. § 75-1.1; Am. Compl. at 6. Plaintiff's Fourth Claim for Relief is for misappropriation of trade secrets (Am. Compl. at 6), although Plaintiff has now moved to voluntarily dismiss this claim. (Docket No. 60.) Finally, Plaintiff's Fifth Claim for Relief is for injunctive relief. (Am. Compl. at 6-7.) Plaintiff seeks actual and punitive damages as relief, and attorney's fees. (*Id*. at 7.)

## DISCUSSION

**A.** **Plaintiff's Motion to Voluntarily Dismiss its Claim of Misappropriation of Trade Secrets (Fourth Claim for Relief)**

Plaintiff moves to voluntarily dismiss without prejudice its claim for misappropriation of trade secrets pursuant to Fed. R. Civ. P. 41(a)(2). (Docket No. 60.) Under that rule, "an action[3] may be dismissed" on the plaintiff's request by court order "on terms that the court

---

[3] This Court recognizes that the language of Rule 41(a)(2) suggests that the rule applies only when the entire action is being dismissed. However, in the Fourth Circuit, similar standards apply whether the motion is made pursuant to Fed. R. Civ. P. 41(a)(2) or Rule 15. *See Miller v. Terramite Corp.*, 114 Fed. Appx. 536, 540 (4th Cir. 2004). Therefore, the Court will consider the motion as filed and briefed under Rule 41(a)(2).

considers proper." Fed. R. Civ. P. 41(a)(2). Unless the order states otherwise, such a dismissal is without prejudice. (*Id*.)

This action was originally filed in state court and removed to this Court by Defendant. (Docket No. 1.) Plaintiff filed its Amended Complaint on February 6, 2007. (Docket No. 13.) Discovery was originally set to close on February 15, 2008 (Docket Nos. 23, 24), but was extended until June 16, 2008. (Docket No. 54.) Substantial discovery material was exchanged between the parties and depositions were taken from January through April 2008. (Docket No. 60 at 3; Docket No. 64 at 2-3.) Plaintiff filed its motion to dismiss its misappropriation of trade secrets claim on April 14, 2008 following this initial exchange of discovery. Plaintiff argues that dismissal of this claim will not delay trial of this matter or unduly prejudice Defendant because no summary judgment motion was filed before the motion to dismiss and because the discovery already taken was necessary to support the remaining claims. (Docket No. 60 at 3.)

Defendant requests that Plaintiff be allowed to dismiss its trade secrets claim but seeks a dismissal with prejudice and to preserve its right to seek at a later date costs, expenses, and attorney's fees related to the defense of the claim. (Docket No. 64 at 1 & n.1.) Defendant agrees that the documents it produced in January 2008 show that no trade secrets of Plaintiff exist or were misappropriated by Defendant, but argues that Plaintiff should have come to the realization that its trade secrets claim lacked merit long before this point. (*Id*. at 4.)

Voluntary dismissals under Rule 41(a)(2) should be freely given unless the parties will be unfairly prejudiced. *St. Clair v. Gen. Motors Corp.*, 10 F. Supp. 2d 523, 530 (M.D.N.C. 1998). The court focuses primarily on protecting the interests of the defendant. *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987).

There is no dispute that the parties exchanged substantial discovery within one to three months of Plaintiff filing its motion to dismiss. The motion was filed before the close of discovery on June 16, 2008. The Court therefore finds no substantial delay in Plaintiff's filing of its motion.

In addition, the Court does not find that the existence of the claim prejudiced Defendant by causing a significant increase in discovery. All of the issues of this action are closely connected and much of the discovery material Defendant would rely upon to show the lack of merit of Plaintiff's trade secrets claim is the same as that Defendant relies upon in its motion for summary judgment on Plaintiff's breach of contract claim. In its briefs, Defendant often refers to Plaintiff's breach of contract claim as a contractual trade secrets claim. (Docket No. 64 at 2 n.2.) Finally, in view of this Court's recommendation as to the remaining claims and Plaintiff's statement that its expert no longer supports a trade secrets claim (Docket No. 67 at 7), there are no reasonable grounds for concluding that a dismissal with prejudice or upon other conditions is necessary to protect Defendant from any resulting prejudice.

Accordingly, the Court finds that Plaintiff's motion to dismiss its misappropriation of trade secrets claim (Docket No. 60) should be granted as filed.

## B. Defendant's Motion for Summary Judgment

### 1. Standard

Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. (*Id.* at 255.) The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." (*Id*. at 718-19 (citing *Anderson*, 477 U.S. at 247-48).) A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials).

## 2. Plaintiff's Breach of Contract Claim (First Claim for Relief)

Plaintiff alleges in its First Claim for Relief that in 2004 Defendant breached one or more of the confidentiality agreements[4] by using Plaintiff's confidential information in developing Defendant's own Cylosol product.[5] (Am. Compl. at 1-5.) Defendant argues in its motion for summary judgment that Plaintiff cannot show that it breached any of the agreements because all four of the exceptions for non-use in paragraph 11 of the agreements apply to the information Plaintiff supplied to Defendant. (Docket No. 74 at 17.)

Defendant first argues that exception "a" – the "publicly available" exception – applies under the undisputed facts of this case. (Docket No. 75, Exs. 15-17.) This exception

_____

[4] The parties agree that Delaware law controls the contract claim pursuant to the terms of the contract. (Docket No. 75, Exs. 15-17, ¶ 20.) Under Delaware law, to state a claim for breach of contract Plaintiff must show a valid contract, a breach of that contract, and damages caused by the breach. *H-M Wexford LLC v. Encorp., Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[5] In its response brief, Plaintiff alleges two additional breaches: (1) Defendant's use of information learned in the testing of XP as a "benchmark" for the evaluation and continued development of Cylosol; and (2) Defendant's disclosure of information learned in the testing of XP to third parties. (Docket No. 79 at 19-20.) Plaintiff failed to plead the first additional breach. (Docket No. 13.) There is no mention in Plaintiff's Amended Complaint about Defendant improperly "benchmarking" the performance of XP. (*Id.*) This claim should therefore be dismissed. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 Fed. Appx. 556, 563 (4th Cir. 2008) (plaintiff may not amend complaint by argument in brief opposing summary judgment).

The claim that Defendant improperly disclosed information learned in the testing of XP to third parties also is not pled and should be dismissed. This claim may arise out of the factual allegation in the Amended Complaint that in June 2006 Defendant "began disparaging plaintiff's alternative solvents to plaintiff's customers as damaging to equipment used in the printing industry." (Am. Compl. ¶ 10.) However, that allegation is not linked to Defendant's testing of XP. (*Id.*) In addition, this claim falls outside of Plaintiff's identification of the breach in paragraph 11 of its Amended Complaint. (*Id.* ¶ 11.)

-9-

applies to any items designated as confidential[6] by a party but which are "available to the public or become available to the public through no fault, unauthorized act or omission by the Recipient." (*Id*. ¶ 11(a).) Defendant contends that the use of benzyl alcohol as a co-solvent and the combination of benzyl alcohol as a co-solvent and Isopar L as a non-solvent in a flexographic developer solvent was available to the public, primarily through published patents, for many years before the alleged 2004 breach.[7] (Docket No. 74 at 17.) In response, Plaintiff argues in briefing that Defendant "cannot point to a single patent that teaches the specific advantages of using benzyl alcohol in tandem with Isopar L to produce a flexographic washout solvent."[8] (Docket No. 79 at 16.)

Defendant maintains that it need not show pursuant to paragraph 11 of the contracts that the "specific advantages" of this combination were known. (Docket No. 84, Def.'s Reply Br. in Supp. of Mot. for Summ. J. at 4.) Nonetheless, the Court finds that it need not resolve the question of whether the contract requires that all "specific advantages" of the combination be available. There is no genuine issue of material fact as to whether the only

_____

[6] The Court will assume for purposes of this Recommendation that the information exchanged was designated as confidential under the agreements.

[7] There is no issue of fact that the publication of these patents, or other releases of information, occurred through no fault, unauthorized act or omission by DuPont.

[8] The basis for Plaintiff's contention that the "specific advantages" of the use of these two ingredients in a solvent be publicly available is not clear. (Docket No. 79 at 16.) It apparently arises from Plaintiff's interpretation of Delaware case law. *See id.* at 14 (quoting *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 Del. Ch. LEXIS 242, *55-56 (Del. Ch. Aug. 5, 1999).)

specific advantages of the combination of benzyl alcohol and Isopar L in a solvent which have been identified as relevant by Plaintiff, namely high performance and low odor, were publicly available when Plaintiff alleges the breach occurred in 2004.

Defendant relies upon deposition testimony to establish that the combination of benzyl alcohol and Isopar L was publicly known several years before 2004. Plaintiff's president, David Bradford, agreed during his deposition that at least by 2004 it was commonly known that benzyl alcohol and Isopar L were used as ingredients in flexographic printing solvents. (*See* Docket No. 75, Ex. 3 at 96-97.) In addition, Plaintiff's own expert Dr. Rustom Kanga testified that it would be correct to say that benzyl alcohol and Isopar L in combination, as well as the principles of their operation in a flexographic printing solvent, "have been available to the public since the year 2000." (*Id*., Ex. 2 at 140-41.) Plaintiff's contract chemist, Dr. Connie Hendrickson, agreed during her deposition that both benzyl alcohol and Isopar L "are used in a number of commercially available solvents." (*Id*., Ex. 1 at 245.)

Defendant DuPont also relies upon the public patents which referenced this combination of ingredients to show public availability. Patent number 6,162,593 was issued on December 19, 2000. (Docket No. 84, Ex. B.) This patent "describes photopolymer printing plate developing solvents comprising diisopropylbenzene, alone or in combination with one or more co-solvents." (*Id*.) In example 9 of table 2 of that patent a solvent containing diisopropylbenzene, benzyl alcohol, and Isopar L is reported as having a "mild" odor and "excellent" image quality. (*Id*. at cols. 11 & 12.) Example 14 of table 3 in that

-11-

same patent uses a different printing plate and thickness and reports the same results for a solvent containing the same ingredients.

In addition, patent number 6,248,502 B1 was issued on June 19, 2001. (Docket No. 84, Ex. C.) The assignee of this patent is Plaintiff. It concerns a developer solvent for photopolymer printing plates and method. (*Id*.) This patent identifies a "particularly preferred composition" in which benzyl alcohol is a co-solvent and "the non-solvent is an isoparaffinic hydrocarbon." (*Id*. col. 5 at 37-40.) An example of an isoparaffinic hydrocarbon is later identified as Isopar L. (*Id*. col. 5 at 66-67 and col. 6 at 1-2.) The patent notes that one benefit of using isoparaffinic solvents as the non-solvent base is "lower odor characteristics." (*Id*. col. 6 at 8-21.)

Patent number 6,682,877 B2 was issued on January 27, 2004, before Plaintiff produced the samples of XP to Defendant later in 2004 and before its chemical properties were made known to Defendant by Plaintiff. (Docket No. 84, Ex. D; Am. Compl. ¶ 8; Docket No. 79 at 8.) This patent describes photopolymer printing plate developing solvents. (Docket No. 84, Ex. D.) Mixtures containing benzyl alcohol and Isopar L are reported in tables 1, 2, and 3. (*Id*.) Each of these examples reports "mild" odor of the solvent, "excellent" image quality, and, for all but one of the other reported formula examples, the quickest drying time.[9] (*Id*.)

---

[9] A quicker drying time for a solvent is considered a benefit. (Docket No. 75, Ex. 9 at 4-5.)

Finally, Defendant shows that the benefits of combining benzyl alcohol and Isopar L in a solvent were made known to it by a competitor of Plaintiff as early as March 21, 2000. (Docket no. 75 ex. 57.) An email written by one of Defendant's employees on that date states that Plaintiff's competitor, T2, reported that day about a new solvent it was recommending which included benzyl alcohol and Isopar L. (*Id*.) The email states that T2 claims that this solvent "has low odor" and other favorable characteristics. (*Id*.)

Plaintiff recognizes that Defendant "has presented a series of patents that purport to show how widely known the use of benzyl alcohol and Isopar L separately, and in a few instances, together, are in flexographic washout solvents." (Docket No. 79 at 16.) Plaintiff argues, however, that these patents do not teach the "specific advantages" of such a combination. (*Id*.) However, as shown by the excerpts of the patents above, the advantages of high performance (excellent image quality; rapid drying) and low or mild odor are described by these patents. Plaintiff's contention that the patents fail to show the specific advantages of combining benzyl alcohol and Isopar L must therefore be rejected.

Plaintiff also relies upon case law which stands for the proposition that publication in a patent of steps of a process does not necessarily make the use of those steps publicly available. (Docket No. 79 at 13 (citing *SmithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000); *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 Del. Ch. LEXIS 242, *55-56 (Del. Ch. Aug. 5, 1999).) This authority is, however, unpersuasive in the present context because the confidential items at issue in this action are not a process.

-13-

They are simply two ingredients which may be combined in a solvent to produce a high performance, low odor solvent. Plaintiff does not allege any confidential process related to XP in its First Claim for Relief. (Am. Compl. at 1-5.) In its briefs, Plaintiff also fails to identify a confidential process related to the production of XP. The breach alleged is the use of confidential information to "develop the formula used in Cylosol." (Docket No. 79 at 19; *see also id.* at 10 (Defendant blended solvent containing Isopar L and benzyl alcohol in combination); *id*. at 16 (Defendant's chemist learned that XP contained benzyl alcohol and Isopar L); *id*. at 17 (DuPont arrived at formula for Cylosol after testing XP); *id*. at 20 (DuPont chemist Subramanian only developed formula for Cylosol after testing XP and being informed of its components).) The determinative question is therefore not whether a process was publicly available, but whether the combination of benzyl alcohol and Isopar L was available to the public.

In oral argument, Plaintiff asserted that Defendant could not rely on the apparent public availability of the supposed confidential items unless Defendant also shows that it relied exclusively on that information to develop its product. However, exception "a" of the CDA's contains no such limitation. It only requires that the item be or become available to the public through no fault of the recipient. Plaintiff's argument improperly seeks to add a requirement to exception "a" more similar to the requirements of exception "b" (requiring knowledge of confidential items by recipient at time of disclosure) or "d" (independent development). Nonetheless, Plaintiff is not free to add to terms of the CDA's simply for the

-14-

purpose of avoiding summary judgment. Therefore, the Court rejects Plaintiff's argument based on the plain language of the contract.

In sum, Plaintiff has failed to show that a genuine issue of material fact exists with respect to the application of exception "a" of paragraph 11 of the pertinent confidentiality agreements to any confidential information Plaintiff revealed to Defendant. Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.[10]

### 3.    Plaintiff's Fraud Claims (Second Claim for Relief)

Plaintiff alleges in its Second Claim for Relief that Defendant made "promises and misrepresentations" as part of its fraudulent plan and scheme to acquire Plaintiff's confidential and protected alternative solvent technology. (Am. Compl. ¶ 13.) Specifically, Plaintiff alleges that Defendant "fraudulently misrepresented its ability and desire to internally develop a new flexographic washout solvent." (Docket No. 79 at 23.) Plaintiff also alleges that Defendant's employee Cunningham "fraudulently misrepresented to [Plaintiff's president Bradford], in early November 2004, that DuPont was interested in putting together a supply agreement with [Plaintiff] before the end of the year." (*Id*. at 24.) Plaintiff contends that Defendant "fraudulently concealed that it had found a new supplier of Exxates, the active ingredient for Optisol." (*Id*. at 26.) Finally, Plaintiff claims that

---

[10] Defendant argues that the remaining three exceptions, "b-d," also apply and are fatal to Plaintiff's breach of contract claim. (Docket No. 84 at 6-9.) The Court does not reach these other exceptions because exception "a" is clearly shown by the undisputed evidence.

Defendant "had a duty to disclose that it was testing flexographic washout solvents from competitors of [Plaintiff]." (*Id*. at 27.)

The parties agree that North Carolina law controls Plaintiff's fraud claim. (Docket No. 74 at 21; Docket No. 79 at 21-22.) Plaintiff must show (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party. *Forbis v. Neal*, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387 (2007). In addition, the plaintiff must state with particularity the time, place and content of the false representation. *Coley v. North Carolina Nat'l Bank*, 41 N.C. App. 121, 125, 254 S.E.2d 217, 219 (1979).

The only evidence Plaintiff points to in support of its contention that Defendant misrepresented its ability and desire to internally develop a solvent is the affidavit of Plaintiff's president. (Docket No. 79 at 23-24) (citing paragraphs 7 & 13.) Mr. Bradford states that "DuPont informed me at the December 4, 2003 meeting, as it had on numerous prior occasions, that the process for obtaining approval for the development, testing, marketing and sale of a new solvent by DuPont is a lengthy and difficult process which they did not have the time or resources to perform." (Docket No. 80, Ex. 6 at 7.) He further states that he was "repeatedly informed that it was easier, more cost effective and more productive for DuPont to evaluate other commercially available solvents and to license or purchase those solvents as this could be done more quickly and cheaply." (*Id*. at 7-8.)

-16-

Defendant argues that Plaintiff fails to state with particularity the maker of the alleged misrepresentations or prove that the individual acted with the required knowledge of falsity and intent to deceive. (Docket No. 84 at 11-12.) In fact, the Court finds that Plaintiff's assertions of who made the misrepresentations as to Defendant's desire or ability to develop its own solvent are exceedingly vague. (Docket No. 79 at 22-24.) In most instances Plaintiff refers to "DuPont" or "Defendant's employees" without identifying an individual as the speaker. (*Id*.) Mr. Bradford's affidavit suffers from the same defects. (Docket No. 80, Ex. 6 ¶¶ 13, 16.) The one employee particularly identified in Plaintiff's brief is Defendant's chemist, Rajgopal Subramanian. (Docket No. 79 at 24.) However, the portions of Mr. Subramanian's affidavit that Plaintiff relies upon show only that Mr. Subramanian states that he "clearly told [Bradford] that we have an internal product development effort underway." (Docket No. 80, Ex. 2 at 186.) Therefore, these excerpts fail to show that this particular individual misrepresented that Defendant had no desire to internally develop its own solvent. Plaintiff has failed to state with particularity the time, place, content, and speaker of the allegedly false representations.

Plaintiff also relies on its President's affidavit to support the second allegedly fraudulent representation by Defendant's employee Ms. Cunningham. Mr. Bradford states in his affidavit that "Ms. Cunningham agreed to try to convince DuPont to provide me with a final decision on the supply agreement and its terms by the end of the year." (Docket No. 80, Ex. 6 at 9 ¶ 14.) Nonetheless, the Court observes that such a promise to "try to convince

-17-

DuPont" to decide on the agreement is far removed from Plaintiff's allegation that Defendant through Ms. Cunningham "agreed to have a supply agreement done by the end of the year." (Docket No. 79 at 24.) The version of the statement in Mr. Bradford's affidavit fails to show that Defendant promised any agreement with Plaintiff by the end of the year. That version is neither a "definite and specific misrepresentation of a subsisting or ascertainable material fact" nor a promissory representation to make a supply agreement with Plaintiff, as Plaintiff argues. (*Id*. at 22-24.) *See Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 659 (1992) (requiring definite and specific representation and not guesses or assertions of opinions.) Plaintiff's second allegedly fraudulent statement therefore fails for lack of evidentiary support.

Plaintiff's final two alleged fraudulent misrepresentations are omissions. Plaintiff pled only "promises and misrepresentations" in its Amended Complaint. (Am. Compl. at 5.) Therefore, the Court agrees that Plaintiff failed to plead these omissions and that they should be dismissed on that basis. *See Barclay White*, 262 Fed. Appx. at 563 (plaintiff may not amend complaint by argument in brief opposing summary judgment).

Moreover, these final two allegations of omissions could not support relief even if they are considered. Plaintiff recognizes that in order to prove actionable fraud by silence or omission it must show that Defendant had a legal duty to communicate the material matter to Plaintiff. (Docket No. 79 at 25 (citing *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997)).) The case law relied upon by Plaintiff fails to show that in North

-18-

Carolina the facts and circumstances of the present case created a duty imposed upon Defendant to advise Plaintiff either that Defendant had located a new supplier for exxates or that it was testing solvents from competitors of Plaintiff. The cases relied upon by Plaintiff in its response brief involve omissions between parties who are associated as employer and employee or buyer and seller in a completed transaction, and other instances of alleged fraudulent omissions arising out of events surrounding a completed contractual undertaking. (Docket No. 79 at 21-28.) The factual settings of these cases are not negotiations between sophisticated business persons which ultimately fail to produce an enforceable contract, as in the present action.

In contrast, the cases relied upon by Defendant are factually similar to the present action. In *Big Red, LLC v. Davines S.P.A.*, 31 Fed. Appx. 216 (4th Cir. 2002), the plaintiff was a distributor of women's hair products and the defendant was an Italian manufacturer of such products. Plaintiff asserted causes of action for fraud, negligent misrepresentation, and unfair and deceptive trade practices. The district court dismissed plaintiff's case on defendant's motion to dismiss. Plaintiff appealed only the dismissal of its unfair and deceptive trade practices claim. Plaintiff alleged that defendant orally agreed to make plaintiff its exclusive distributor in a designated southeastern region and that the parties "shook hands" on plaintiff becoming a master distributor of defendant's products. (*Id*. at 217-18.) Although the parties never entered into a binding, written agreement, plaintiff alleged that it ordered significant quantities of defendant's products and leased warehouse

-19-

space in anticipation of becoming an exclusive distributor and in reliance upon representations made up to that point. (*Id.*) Plaintiff brought suit when it heard rumors that defendant was negotiating with another company to become its master distributor.

In concluding that defendant had "no duty to disclose to [plaintiff] its intentions regarding the outstanding negotiations between them or that it had chosen to entertain negotiations with another prospective distributor," the Fourth Circuit relied to a large extent on a North Carolina action, *Computer Decisions, Inc. v. Rouse Office Mgmt.*, 124 N.C. App. 383, 387, 477 S.E.2d 262, 265-66 (1996). *Big Red*, 31 Fed. Appx. at 222. Computer Decisions sued a prospective landlord after their negotiations for leasing office space fell through. In the final negotiations to reduce the "deal" already allegedly made, Computer Decisions learned that the landlord had been negotiating with a different prospective tenant who eventually became the tenant of the space. (*Id.* at 221.) Computer Decisions brought claims of breach of lease, fraud, negligent misrepresentation, and unfair and deceptive trade practices. The suit was dismissed on summary judgment. The court of appeals affirmed after finding, in the language of the *Big Red* court, that the "prospective landlord negotiating at arms-length with Computer Decisions had no duty to inform Computer Decisions of its discussions with another prospective tenant." (*Id.*) The landlord was simply exercising its right to contract freely with whomever it chose. (*Id.*)

*Big Red* and *Computer Decisions* show that Defendant in the present action was not under a duty to advise Plaintiff that it had found a new supplier of exxates or that it was

testing the solvents of Plaintiff's competitors. Plaintiff does not attempt to distinguish these cases on this point in its response brief. (Docket No. 79 at 27-28.) Absent a legal duty to communicate these matters to Plaintiff, Plaintiff cannot make out a claim of actionable fraud based on these alleged omissions. *See Breeden*, 171 F.R.D. at 196.

In its reply brief, Defendant DuPont argues additionally that Plaintiff has shown no evidence of reliance damages and that this is fatal to all of Plaintiff's fraud claims. (Docket No. 84 at 14.) The only fraud damages sought by Plaintiff are in fact those that would be recoverable on a contract claim, according to Defendant. (*Id*.) Defendant points out that in answering an interrogatory, Plaintiff identified its damages on the fraud claim only as the "lost sales" of Plaintiff's alternative solvent products and the "sales" of Defendant's Cylosol product. (Docket No. 75, Ex. 80 at 10.) Defendant argues that this lack of reliance damages is fatal to Plaintiff's fraud claims. *See Wall v. Fry*, 162 N.C. App. 73, 79, 590 S.E.2d 283, 287 (2004) (necessary element of fraud claim is that plaintiff suffered damages because of his reliance on defendant's representations.)

During oral argument Plaintiff identified only "fraud" damages such as lost sales which would arise from Defendant's alleged breach of the CDA agreements. This fact raises the question whether Plaintiff's fraud claims are deficient because they are not "independent" tort claims but rather are, at bottom, part of Plaintiff's contract claims. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998); *Strum v. Exxon Co.*, 15 F.3d 327 (4th Cir. 1994).

-21-

In *Broussard*, the Fourth Circuit found that the district court erred by allowing the plaintiffs to advance tort and Unfair Trade Practices Act counts paralleling their breach of contract claims. 155 F.3d at 346. In North Carolina, tort claims which arise out of breach of contract claims are allowed only in "carefully circumscribed" circumstances. (*Id.*) Tort claims are allowed only on claims which are "identifiable" and "distinct from the primary breach of contract claim." (*Id.*)

The tort claims that Plaintiff attempts to advance in this action may be "identifiable," but they are not "distinct from" the primary breach of contract alleged by Plaintiff. Each of Plaintiff's tort claims arise out of Defendant's performance on the CDA agreements. Plaintiff claims that by developing its own solvent, Defendant breached the confidentiality agreement. (Docket No. 79 at 1-2.) Plaintiff's first fraud claim, that Defendant misrepresented its desire or ability to internally develop its own solvent, is not distinct from the contract claim. Similarly, Plaintiff's claim that Defendant committed fraud by misrepresenting its desire to enter into a supply agreement with Plaintiff arises out of Defendant's performance on the confidentiality agreement. The purpose of the confidentiality agreement was to explore the possibility of such a business arrangement. Plaintiff claims that Defendant's concealment of its arrangement for a new supplier of exxates allowed Defendant to test XP in 2004 as contemplated by the CDA agreements. (*Id.*) Therefore, this fraud claim also arises out of the contract. Finally, Plaintiff alleges that Defendant concealed that it was testing the solvents of Plaintiff's competitors and Plaintiff's

-22-

president states that if he had known this he would not have provided Defendant with XP under the CDA agreements. (Docket No. 80, Ex. 6 at 8.) Therefore, all of Plaintiff's tort claims arise out of the confidentiality agreements and the alleged breaches of those agreements. They are not independent torts as required by North Carolina law. They must therefore be dismissed on this ground, as well. *See Broussard*, 155 F.3d 331.

4. **Plaintiff's Unfair and Deceptive Trade Practices Claim (Third Claim for Relief)**

Plaintiff claims in its Third Claim for Relief that Defendant violated the North Carolina Unfair and Deceptive Trade Practices Act. *See* N.C. Gen. Stat. § 75-1.1. Plaintiff's claim is based on its claims of fraud and breach of contract. (Am. Compl. at 6; Docket No. 75, Ex. 80 (answer to interrogatory 8 stating that Defendant's fraudulent conduct supports unfair trade practices claim).) Because summary judgment should be granted to Defendant on Plaintiff's fraud and breach of contract claims, summary judgment is also appropriate on Plaintiff's unfair trade practices claim based on those claims. *See Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 373-74, 555 S.E.2d 634, 642 (2001). Additionally, there are no "substantial aggravating circumstances" required to support a claim under the Act. *See Broussard*, 155 F.3d at 347.

5. **Plaintiff's Claim for Injunctive Relief (Fifth Claim for Relief)**

Plaintiff claims in its Fifth Claim for Relief that Defendant should be enjoined from marketing Cylosol. (Am. Compl. at 6-7.) Because summary judgment should be granted

-23-

against Plaintiff on all of its underlying claims for relief, this request for injunctive relief should also be dismissed.

## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Docket No. 73) be granted in full.  Further, **IT IS RECOMMENDED** that Plaintiff's motion to dismiss its misappropriation of trade secrets claim (Docket No. 60) be granted as filed, and that this action be dismissed.


_____/s/ P. Trevor Sharp_____
United States Magistrate Judge


Date: October 20, 2009